1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TOSTRUD LAW GROUP, P.C.**
JON A. TOSTRUD
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 278-2600
Facsimile: (310) 278-2640
Email: jtostrud@tostrudlaw.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RAJENDER CHEEKATAMARLA, Derivatively on Behalf of LENDINGCLUB CORPORATION, | Case No.: 3:19-cv-563 |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| SCOTT SANBORN, DANIEL CIPORIN, KENNETH DENMAN, JOHN J. MACK, TIMOTHY MAYOPOULOS, PATRICIA MCCORD, MARY MEEKER, JOHN C. MORRIS, SIMON WILLIAMS, AND THOMAS W. CASEY, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| -and- | |
| LENDINGCLUB CORPORATION, | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Plaintiff Rajender Cheekatamarla ("Plaintiff"), by and through his undersigned counsel,

2   derivatively on behalf of Nominal Defendant LendingClub Corporation ("LendingClub" or the

3   "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint").

4   Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and

5   upon information and belief, developed from the investigation and analysis by Plaintiff's counsel,

6   including a review of publicly available information, including filings by LendingClub with the

7   U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports,

8   investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

9                              **NATURE OF THE ACTION**

10   1.   This is a shareholder derivative action brought in the right, and for the benefit, of

11   LendingClub against certain of its officers and directors seeking to remedy Defendants' violations

12   of state and federal law that occurred from May 9, 2016 through the present (the "Relevant

13   Period") and have caused substantial harm to LendingClub.  Plaintiff seeks to remedy Defendants'

14   violations of state and federal law during the relevant period that have caused and continue to

15   cause substantial monetary losses to LendingClub and other damages, including damages to its

16   reputation and goodwill.

17   2.   LendingClub operates an online lending marketplace platform that connects

18   borrowers and investors.  The Company offers unsecured consumer loans through its website,

19   www.lendingclub.com.

20   3.   During the Relevant Period, LendingClub misrepresented to prospective borrowers

21   that its loans included "no hidden fees".  Further, during the Relevant Period, LendingClub

22   routinely misrepresented to prospective borrowers that their loan had been approved when, in fact,

23   the loan was not approved.  Additionally, during this same time, LendingClub failed to provide

24   consumers with clear and conspicuous privacy notices.

25   4.   LendingClub's wrongful conduct came to light on April 25, 2018, when the Federal

26   Trade Commission ("FTC") issued a press release and filed its action, *Federal Trade Commission*

27   *v. LendingClub Corporation, etc*., Case No. 3:18-cv-02454 (USDC, Northern District of CA, S.F.

28   Division) (the "FTC Complaint").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**JURSIDICTION AND VENUE**

5.        Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

6.        This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

7.        Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) LendingClub maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to LendingClub, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

8.        *Plaintiff Rajender Cheekatamarla* ("Plaintiff") is a current owner of LendingClub stock and has held the stock during the time of Defendants' continuous wrongful course of conduct alleged herein.   Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Company.

**Nominal Defendant**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

9.      Nominal Defendant LendingClub is a Delaware corporation with its principal executive offices located at 71 Stevenson Street, Suite 1000, San Francisco, California. LendingClub trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LC".

**Director Defendants**

10.     *Defendant Scott Sanborn* ("Sanborn") joined LendingClub in 2010.   He was appointed as its Chief Executive Officer ("CEO") and joined the Company's Board of Directors ("Board') in 2016.  Defendant Sanborn sold 294,276 shares of Company stock between August 15, 2016 and November 13, 2017, at artificially-inflated prices, for proceeds of $1,680,539.68.

11.     *Defendant Daniel Ciporin* ("Ciporin") has served as a member of the LendingClub Board since 2007.  Ciporin is chair of the Company's Compensation Committee and is also a member of its Audit Committee.

12.     *Defendant Kenneth Denman* ("Denman") has served as a member of the LendingClub Board since 2017.  Denman is a member of LendingClub's Audit Committee and Compensation Committee.

13.     *Defendant John J. Mack* ("Mack") has served as a member of the LendingClub Board since 2012.  Mack is chair of the Company's Nominating and Corporate Governance Committee and is also a member of its Compensation Committee.

14.     *Defendant Timothy Mayopoulos* ("Mayopoulos") has served as a member of the LendingClub Board since 2016.  Mayopoulos is a member of LendingClub's Audit Committee and Risk Committee.

15.     *Defendant Patricia McCord* ("McCord") has served as a member of the LendingClub Board since 2017.  McCord is a member of the LendingClub's Compensation Committee and Nominating and Corporate Governance Committee.

16.     *Defendant Mary Meeker* ("Meeker") has served as a member of the LendingClub Board since 2012.  Meeker is a member of the LendingClub's Nominating and Corporate Governance Committee.

17.  **Defendant John C. Morris** ("Morris") has served as a member of the LendingClub Board since 2013, and presently serves as its Chairman of the Board.  Morris is chair of the Company's Risk Committee.

18.  **Defendant Simon Williams** ("Williams") has served as a member of the LendingClub Board since 2014.  Williams is chair of the Company's Audit Committee and is also a member of its Risk Committee.  Williams sold 330,000 shares of Company stock between March 1, 2017 and May 10, 2017, at artificially-inflated prices, for proceeds of $1,791,362.

19.  **Non-party Susan Athey** ("Athey") has served as a member of the LendingClub Board since March 2018.

20.  Defendants Sanborn, Ciporin, Denman, Mack, Mayopoulos, McCord, Meeker, Morris, and Williams are referred to herein as the "Director Defendants".

**Company Officers**

21.  **Defendant Thomas W. Casey** ("Casey") is, and was at all relevant times, the Chief Financial Officer ("CFO") of LendingClub.  Casey sold 22,766 shares of Company stock between November 28, 2016 and August 28, 2017, at artificially-inflated prices, for proceeds of $132,788.11

## LENDINGCLUB'S CORPORATE GOVERNANCE

22.  As members of LendingClub's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

23.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of LendingClub, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DIRECTOR DEFENDANTS

24.  By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of LendingClub, the Director Defendants owed LendingClub and its investors the fiduciary obligations of trust, loyalty, and

good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage LendingClub in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of LendingClub and its investors.

25.     Each director of the Company owes to LendingClub and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

26.     To discharge their duties, the officers and directors of LendingClub were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of LendingClub were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how LendingClub conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or

practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

27.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of LendingClub, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

28.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, LendingClub has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

**The Company's Prior Deceptive Conduct and Lack of Internal Controls**

29.     In May 2016, the Company disclosed that it had engaged in material deceptive conduct involving senior executives and managers knowingly misleading investors as to the characteristics of certain loans.  The Company stated that "material weaknesses in internal control over financial reporting" had manifested in undisclosed self-dealing, sales of non-conforming loans, backdated loan applications, and such a damaged reputation, that after years of proclaiming itself to be a neutral market maker that was not taking on credit risk, the Company openly acknowledged that it had become its own best prospect for new business.  At the center of this

wrongdoing was Renaud Laplanche, the Company's founder, and then Chairman, and CEO, as well as multiple "senior managers," all of whom were terminated or forced to resign.

30.     As a direct result of the above, analysts downgraded the Company's stock based on its lack of critical internal controls.  For example, analyst Eric Wasserstrom of Guggenheim issued an analyst report on May 12, 2016 stating:

> Our downgrade was consistent with our view that marketplace lending companies need to demonstrate strength in the four pillars that are critical to the success of any lending company: dynamic and defensible underwriting; strong credit risk management capabilities; a durable undoing structure; ***and a culture of regulatory compliance***. While we believe that 1Q results demonstrated that LC is well positioned on the first three of these criteria, the disclosure of a series of control failures underscored its need to improve its oversight and compliance related to internal control issues.  [Emphasis added].

31.     The Company knew that the market needed to be assured of the quality of the Company's internal controls and the integrity of its business practices, especially given the decline in the stock price that the revelation of the Company's previous wrongdoing had caused.  In the quarterly report on Form 10-Q that Defendants caused the Company to file with the SEC on May 16, 2016, Defendants stated, "[i]n the five business days since the announcement of the internal board review described below, the Company has been actively exploring ways to restore investor confidence in its platform and obtain additional investment capital for the platform."

32.     The market and analysts were extremely focused on the Company's regulatory issues going forward.  For example, analyst Eric Wasserstrom from Guggenheim issued a report on May 12, 2016 reporting, "Our downgrade was consistent with our view that marketplace lending companies need to demonstrate strength in the four pillars that are critical to the success of any lending company: dynamic and defensible underwriting; strong credit risk management capabilities; a durable funding structure; and a culture of regulatory compliance.   While we believe that 1Q results demonstrated that LC is well positioned on the first three of these criteria, the disclosure of a series of control failures underscored its need to improve its oversight and compliance related to internal control issues."

33.    Wasserstrom also issued an analyst report on November 7, 2016 reiterating his view of the four pillars of success and stating that "the actions management has taken in response to its prior control failures suggest to us that it is improving its compliance culture."

34.    Despite the Company's false statements regarding its regulatory compliance and deceptive conduct, analysts viewed the Company's efforts to improve its controls and reputation increasingly positively in 2017 and into 2018, issuing buy recommendations and believing the Company was getting back on track.  Analysts from Guggenheim issued several analyst reports during this timeframe, reiterating buy rating, and on February 21, 2018 after the Company's settlement of their class action law suit related to its previous internal control issues, stated that it believed the troubles were behind the Company.   Jeff Cantwell of Guggenheim similarly maintained his buy rating on August 7, 2017.

**The Company's Borrowing Platform**

35.    The Company's borrowers apply for loans through the Company's website.  The Company reviews the applicant's credit worthiness and matches the borrower with a lender or lenders to fund entire loans, portions of individual loans, and/or portions of pools of loans.  In order to avoid state banking regulations, the Company uses its primary issuing bank partner, WebBank, which simultaneously originates each loan and sells it to the Company (at a price that includes modest fees and interest).  The Company buys these loans with the money from its "matched" lenders, and services the loans.  For its role, the Company receives an initial origination fee and subsequent servicing fees on each payment throughout the term of the loan.

36.    Because the Company makes most of its money from origination and servicing fees (on loans it originates), it repeatedly emphasized the importance of loan originations to its financial results, stating in relevant part:

> We believe originations are a key indicator of the adoption rate of our marketplace, growth of our brand, scale of our business, strength of our network effect, economic competitiveness of our products and future growth. Loan originations have grown significantly over time due to increased awareness of our brand, our high borrower and investor satisfaction rates, the effectiveness of our borrower acquisition channels, a strong track record of loan performance and the expansion of our capital resources.

37.     The Company described its marketplace as one in which (i) customers borrow to lower the cost of their credit and enjoy a "better experience" than traditional bank lending; and (ii) "lenders" earn attractive risk-adjusted returns from an asset class that has generally been closed to individuals and is available to institutional investors on only a limited basis.

38.     The Company also emphasized that one of its competitive advantages was its transparency of reporting.  The Company's 2016 and 2017 10-K's filed with the SEC during the Relevant Period stated:

> ***Transparency and Fairness***.  The installment loans offered through our marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty.  [Emphasis in original].

39.     During the Relevant Period, many borrowers learned of the Company's products through its advertisements.  In those advertisements, both in writing and online, the Company often represented that it charged "no hidden fees."

40.     Although it actively promoted to borrowers that it charged "no hidden fees," the Company charged consumers an up-front fee that was not clearly and conspicuously disclosed, burying reference to the fee multiple clicks into the Company's website.  The Company calculated this hidden fee as a percentage of the requested loan amount -- on average, approximately 5%. The fee often exceeded one thousand dollars.

41.     The Company deducted the hidden, up-front fee from the "Loan Amount" before disbursing the loan funds to the borrower.  As a result, in most cases, borrowers received materially less loan proceeds than they believed they had contracted.  More, borrowers paid interest on the entire "Loan Amount," including the fee – principal that they never received.

42.     According to confidential witnesses in the securities class action entitled *Veal v. LendingClub Corp., et al.*, Case No: 5:18-cv-2599-BLF (N.D. Cal.) ("Securities Class Action"), upon information and belief, Confidential Witness ("CW") 1 worked as a member support representative at the Company from March 2016 to March 2018 in the Company's main office in San Francisco, and reported to the Operations Supervisor, who in turn reported to the Member Support Manager, CW1 confirmed that the Company misrepresented the existence of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

origination fees in communications with consumers and stated that for online applicants, the only place the one-time fee was mentioned was far down the page and in very small print.

43.     Upon information and belief, CW1 also stated that the Company routinely trained and managed its support representatives to ensure consumer confusion.  For example, according to the Securities Class Action, CW1 stated that the Company timed each support call, and managers directed support representatives to devote no more than four minutes and thirty seconds to each call, an insufficient time to answer potential borrowers' questions about the loan process.  CW1 further stated that the Company's management knew that support representatives were not adequately informing consumers about the loan process and hidden fees. CW1 stated that representatives never explicitly let consumers know about the origination fee – it was up to the consumers to find and read it.  Further, management instructed representatives not to read truth-in-lending disclosures to consumers.

44.     Upon information and belief, CW1 further stated that the Company's managers, including CW1's direct supervisors and Company executives, including Defendant Sanborn, were aware of the confusion consumers faced due to the Company's misleading statements.  CW1 stated that given the general awareness within the Company of the hidden fee problem and Defendant Sanborn's hands-on management style, Defendant Sanborn and other top management were aware that the Company was misleading potential borrowers about the hidden origination fees.

45.     Borrowers frequently complained to the Company throughout the Relevant Period that they were not aware of the origination fee that the Company deducted from the full "Loan Amount."  In many cases, the Company's deducting of the origination fee caused the loan amount received to be insufficient to accomplish the purpose of the loan, *e.g.*, paying off a certain debt or covering certain large living expenses.

46.     During the Relevant Period, many potential borrowers did not know that the Company would deduct an up-front fee from their loan proceeds.   Borrowers frequently complained that they only discovered the origination fee after the Company disbursed their loan proceeds, when they noticed that the amounts disbursed were smaller than for which they believed

they had contracted. At least tens of thousands of consumers contacted the Company after receiving funds to ask about the up-front fee or to ask why they did not receive the full loan amount.  Many consumers who have complained that they were unaware of the up-front fee attempted to cancel their loans once they learned of the fee, preferring a loan from a competitor or no loan at all.

47.    During the Relevant Period, the Company knew that many potential borrowers were unaware of the origination fee and expected to receive the full loan amount.  The Company's own customer service representative training materials list as one of the two most frequent post-loan disbursement complaints as "I didn't receive the full loan amount."

48.    The Company's quarterly complaint reviews proposed "highlighting [the] origination fee" to address complaint volumes.

49.    Upon information and belief, according to the Securities Class Action, CW2 worked as a senior credit specialist at the Company in the San Francisco office from August 2014 to September 2016.  CW2 spent the first few at the Company working as a member support representative before becoming a credit specialist.  CW2 confirmed that the Company received numerous consumer complaints about the origination fees and participated in regular meetings with Senior Vice President of Operations Darin Cline, in which member support staff voiced concerns about the constant stream of calls from borrowers expressing confusion after receiving loan proceeds less than they expected.

50.    Upon information and belief, according to the Securities Class Action, CW3 worked as a member support representative at the Company from July 2015 to August 2016, and thereafter as a payment processing specialist from September 2016 to September 2017 based at the Company's main office in San Francisco, California.  CW3 confirmed the material number of borrower complaints about the hidden origination fee.  As part of the member support team, CW3 took about 200 calls each day from borrowers, approximately one quarter to one third of those calls from borrowers upset after receiving materially less loan proceeds than they expected.  Many of those borrowers expressed feeling cheated because the Company had claimed they did not

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

charge fees or told them they would receive an amount that differed from what they had ultimately received.

51.     Upon information and belief, according to the Securities Class Action, CW3 also reported that many borrowers attempted to return the money they had borrowed to, and that many were unable to because they had called after their grace period had expired. Borrowers frequently claimed the Company had told them the loan would be "free" and that no fees would be taken off the top. The disclosure letter that borrowers were shown after pre-approval, as they entered the application process, featured the fee disclosure language farther down the form and in several sizes smaller type than the other information.  Many borrowers failed to notice the language because they had been assured there were no hidden fees, and, therefore, were not analyzing the disclosures as closely as they otherwise would have.

52.     Upon information and belief, according to the Securities Class Action, CW3 reported that borrowers were upset because the "free loan" language in the Company's promotional materials led those borrowers to believe that the Company would not take any fees out of the loan amount for which they had been approved.

53.     Upon information and belief, according to the Securities Class Action, CW3 also confirmed that management trained member support representatives specifically to deal with consumers upset about the hidden origination fee.  The Company trained all member support representatives to direct borrowers to where the Company had disclosed the origination fee during the loan process.  The Company trained member support representatives to scroll through large documents with complaining borrowers, showing several lines in far smaller type that summarized the origination fee.

54.     Upon information and belief, according to the Securities Class Action, CW3 stressed how difficult it was for borrowers to notice the fee disclosure during the loan origination process.  CW3 noted the placement of the disclosure of the origination fee and the very small print in which it appeared, much smaller than the amount financed and the amount received.

**Loans Promised**

55.     In addition to misrepresenting to consumers the existence of the hidden origination fee, the Company deceived potential borrowers throughout the loan origination process by various means.

56.     Although the Company told each consumer who completed a personal loan application that his or her "loan is on the way," this misrepresented the actual loan process.  In reality, to receive final approval a potential borrower's application must undergo two additional processes after completion.  First, an application must attract sufficient investor backing, and second, an application must pass the Company's stringent "back-end" credit review -- so called to distinguish it from the less stringent, "front-end" review that the Company conducts while the potential borrower's application was still in progress.

57.     In cases where a consumer had garnered investor funding (but before the Company had finished the "back-end" review), the Company frequently represented that the consumers would receive loans.  For example, the Company sent approximately 196,000 consumers an email the subject line of which reads "Hooray! Investors Have Backed Your Loan."  The body of the email begins, in large, bold print, "Your Loan is 100% Backed," and continues: "Great news! Investors have backed your loan 100%.  Your money is almost in your hands.  You can always visit your Account Summary to view the details of your loan.  Welcome to LendingClub!  All the best, LendingClub."  Upon receiving emails such as these and similar representations, many potential borrowers believed that their loans had been approved, and that they would soon receive the sum they had agreed to.

58.     In reality, however, many consumers who received such representations were subsequently rejected based on the Company's "back-end" credit review and never received a loan from the Company.  For example, of the approximately 196,000 consumers who received the above email, the Company rejected at least 43,000 or 22%.  The "back-end" credit review is comprehensive and often involves, *inter alia*, an additional credit inquiry, a phone call to the potential borrower, requests for additional documentation, and a detailed review of the potential borrower's tax and bank records.

59.    The Company frequently issued back-end denials even to potential borrowers who provided the requested documents, and whose applications were truthful, based upon the Company's further evaluation of the potential borrower.  The Company also issued back-end denials to consumers based on its own errors.

60.    The Company was aware that its representations to potential borrowers were misleading.  The Company's training materials list "What does that mean? I thought I was approved" as a frequently asked question that customer service representatives should expect to hear.

61.    In addition, the Company received numerous complaints from potential borrowers whom the Company rejected after leading them to believe that it had approved their loans, including some who did not seek other credit or turned down offers from the Company's competitors because they believed that they had already obtained a loan from the Company.

**The Company's Unauthorized Bank Account Withdrawals**

62.    During the Relevant Period, the Company's default method of collecting borrowers' scheduled monthly payments was automatic electronic bank account withdrawal via Automated Clearing House ("ACH") transfer.  In numerous instances during the Relevant Period, the Company withdrew money from borrowers' bank accounts without authorization, or in amounts in excess of the amount borrowers had authorized.

63.    The Company frequently charged borrowers double payments without authorization, improperly withdrawing borrowers' monthly payments twice in one month. In numerous other instances, the Company automatically withdrew monthly payments from borrowers' accounts even after borrowers had repaid their loans, in full.  When borrowers asked that the Company stop automatic withdrawals because they wished to pay by check or use a different bank account, the Company frequently disregarded those requests and continued automatic withdrawal.

64.    According to the FTC, during the Relevant Period, borrowers reported to their banks that the Company made at least 3,850 unauthorized withdrawals, a rate materially worse than many of the nation's largest loan servicers. Hundreds of borrowers also contacted the

Company to complain about its unauthorized withdrawals. Most consumers only learned of the unauthorized charges by checking their bank statements, or by learning that their accounts were overdrawn.

65. According to the FTC, the unauthorized withdrawals have been a persistent issue over time. In at least twenty-one of the last twenty-four months, Defendant has made more than one hundred withdrawals that consumers have reported to their banks as unauthorized, and in six of those months, Defendant has made more than two hundred such withdrawals. These numbers are comparable to or worse than those of three of the nation's largest loan servicers, even though those companies service three to four times as many loans as the Company does.

66. According to the FTC, the Company knew or recklessly disregarded the prevalence of these practices. The Company's monthly complaint reporting reflected a growing number of complaints about the payoff process and about payment processing more generally. In addition, the Company's own payments department self-reported increasing numbers of such transactions.

## DEFENDANTS FALSE AND MISLEADING STATEMENTS

67. Throughout the Relevant Period, the Company lured prospective borrowers by promising "no hidden fees". LendingClub's misrepresentations of "no hidden fees" appeared in its advertisements across various media, including mail and online advertising. In fact, LendingClub reduces its loan amount with a hidden up-front fee that is deducted from a borrower's loan proceeds. As detailed in the FTC Complaint:

> Consumers frequently complain to Defendant that they were not aware of the up-front fee that would be deducted from the full "Loan Amount" that they requested. For example, one consumer reported that he applied for $15,000 to cover relocation expenses, and was surprised to receive only $14,000—an amount insufficient to cover his relocation—after Defendant deducted a $1,000 up-front fee. Another consumer applied for a $30,000 loan in order to consolidate his credit card debt at a lower interest rate; because Defendant deducted a $1,200 up-front fee, however, the consumer was unable to pay off his credit card debt in full, leaving him with more bills to pay than he had before.

> Defendant is aware that many consumers do not know about the up-front fee and expect to receive the full loan amount. Defendant's training materials for customer service representatives list "I didn't receive the full loan amount" as one of the two main post-disbursement complaints that representatives should be

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

prepared to address. And Defendant's quarterly complaint reviews have proposed "highlighting [the] origination fee" to address complaint volumes. In addition, internal compliance reviews repeatedly cite the concealment of the fee as a significant problem for consumers. [...]

68.    Additionally, throughout the Relevant Period, the Company also misled consumers about whether their loan applications have been approved by, for example, telling consumers, "Hooray! Investors Have Backed Your Loan" when the Company knew many of these consumers would never receive a loan.  As explained in the FTC Complaint:

Although Defendant has told each consumer who completed a loan application that his or her "loan is on the way," a consumer's application in fact must undergo two additional processes after completion in order to receive final approval. First, an application must attract sufficient investor backing, and second, an application must pass Defendant's stringent "back-end" credit review—so called to distinguish it from the lighter, "front-end" review that Defendant conducts while the consumer's application is still in progress.

69.    The FTC Complaint also details the Company's business practice of withdrawing money from consumers' bank accounts without consumers' authorization, or in amounts in excess of the amount consumers authorized the Company to withdraw.

70.    Finally, the FTC Complaint confirms that the Company failed to deliver the initial privacy notice so that each customer can reasonably be expected to receive actual notice as required by the Gramm-Leach-Bliley Act ("GLBA") and its related Regulation P.[1]

71.    Before the disclosure of this wrongful conduct, on May 9, 2016, the Company issued a press release entitled "LendingClub Reports First Quarter 2016 Results; Chairman & CEO Renaud Laplanche Resigns". This press release was also attached as an exhibit to a Form 8-K filed with the SEC on that date.  Laplanche's removal occurred after ". . . an internal review of sales of $22 million in near-prime loans to a single investor, in contravention of the investor's express instructions as to a non-credit and non-pricing element, in March and April 2016."

---

[1]     Because Defendant is a financial institution that collects nonpublic personal information, it is subject to the requirements of the GLB Privacy Rule, 16 C.F.R. Part 313, and Reg. P., 12 C.F.R. Part 1016, which require financial institutions to provide consumers with an initial and annual privacy notice.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

72.     In the press release, Defendant Sanborn acknowledged that Laplanche's actions, which led to his forced resignation, were "a violation of the Company's business practices" and "unacceptable to the board," and stated that "[*a] key principle of the Company is maintaining the highest levels of trust with borrowers, investors, regulators, stockholders and employees.*" (Emphasis added).

73.     In the May 9, 2016 Press Release, the Company encouraged investors and shareholders to the Company's "Risk Factors" from its Annual Report on Form 10-K for the period ended December 31, 2015 and filed with the SEC on February 22, 2016 ("2015 10-K").

74.     The 2015 10-K provides in relevant part under the section "RISKS RELATED TO OUR BUSINESS AND REGULATION" as follows:

> ***The collection, processing, storage, use and disclosure of personal data could give rise to liabilities as a result of governmental regulation, conflicting legal requirements or differing views of personal privacy rights***.
>
> […]  Our failure to comply with applicable privacy policies or federal, state or foreign laws and regulations or any compromise of security that results in the unauthorized release of personally identifiable information or other user data could damage our reputation, discourage potential borrowers or investors from using our marketplace or result in fines or proceedings brought against us, our issuing banks or other third parties by governmental agencies, borrowers, investors or other third parties, one or all of which could adversely affect our business, financial condition and results of operations. […]  Any inability to adequately address privacy concerns, even if unfounded, or to comply with applicable privacy or data protection laws, regulations and privacy standards, could result in additional cost and liability for us, damage our reputation, inhibit use of our marketplace and harm our business.
>
> * * *
>
> ***We and our issuing bank partners are subject to borrower protection laws and federal and state consumer protection laws***.
>
> We and our issuing bank partners must comply with regulatory regimes, including those applicable to consumer credit transactions, various aspects of which are untested as applied to our marketplace. Certain state laws generally regulate interest rates and other charges and require certain disclosures. In addition, other federal and state laws may apply to the origination and servicing of loans facilitated through our marketplace. In particular, through our marketplace, we may be subject to laws, such as:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 17 -

\* \* \*

- Section 5 of the Federal Trade Commission Act, which prohibits unfair and deceptive acts or practices in or affecting commerce, and Section 1031 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which prohibits unfair, deceptive or abusive acts or practices in connection with any consumer financial product or service;

\* \* \*

- the Gramm-Leach-Bliley Act, which includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they disclose such information and requires financial institutions to disclose certain privacy policies and practices with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information, and other privacy laws and regulations;

\* \* \*

We may not always have been, and may not always be, in compliance with these laws. Compliance with these laws is also costly, time-consuming and limits our operational flexibility.

Failure to comply with these laws and regulatory requirements applicable to our business may, among other things, limit our or a collection agency's ability to collect all or part of the principal of or interest on loans. As a result, we may not be able to collect our servicing fee with respect to the uncollected principal or interest, and investors may be discouraged from investing in loans. In addition, non-compliance could subject us to damages, revocation of required licenses, class action lawsuits, administrative enforcement actions, rescission rights held by investors in securities offerings and civil and criminal liability, which may harm our business and our ability to maintain our marketplace and may result in borrowers rescinding their loans.  [Emphasis added].

75.    Further, on May 9, 2016, the Company held its First Quarter 2016 Earnings Conference Call ("Q1 2016 Earnings Call").  During a discussion of $22 million in near-prime loans that violated the Company's business practices, Defendant Morris stated on behalf of the Company that "*a key principle of the company is maintaining the highest level of trust with borrowers, investors, regulators, stock holders, all our employees.*"   (Emphasis added).

Defendant Morris further stated on behalf of the Company that "[a] violation of the company's business practices . . . was unacceptable to the board.  And this is not something the board will compromise on in anyway."

76.     During the Q1 2016 Earnings Call, Defendant Sanborn also stated that in the wake of Laplanche and other former senior executives' deceit and misconduct, "[o]ur priority is to reaffirm our commitment to trust, compliance and risk management that have been so essential in the success of our online marketplace."

77.     On February 28, 2017, the Company filed its annual report on Form 10-K for the year ended December 31, 2016 with the SEC ("2016 10-K").  Defendant Sanborn and Casey signed the 2016 10-K.  The 2016 10-K included signed SOX certifications by Defendant Sanborn and Casey attesting that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

78.     The 2016 10-K states in relevant part:

**Our Marketplace Solution**

We believe that our marketplace provides the following benefits to borrower:

* * *

- ***Transparency and Fairness***. The installment loans offered through our marketplace feature a fixed rate that is ***clearly disclosed*** to the borrower during the application process, with fixed monthly payments, ***no hidden fees*** and the ability to prepay the balance at any time without penalty. Small business lines of credit have rates based upon the prime rate and allow borrowers to draw in increments, reducing their interest cost. Our platform utilizes an automated, rules-based engine for credit decisioning, which removes the human bias associated with reviewing applications.

* * *

***Current Regulatory Environment***

Privacy and Data Security Laws. The federal Gramm-Leach-Bliley Act (GLBA) includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they

disclose such information, and requires financial institutions to disclose certain privacy policies and practices with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information. *We have a detailed privacy policy, which complies with GLBA* and is accessible from every page of our website. We maintain consumers' personal information securely, and only share such information with third parties for marketing purposes in accordance with our privacy policy and with the consent of the consumer. In addition, we take measures to safeguard the personal information of our borrowers and investors and protect against unauthorized access to this information. [Emphasis added].

79.     The 2016 10-K provides in relevant part under the section "RISKS RELATED TO OUR BUSINESS AND REGULATION" as follows:

> *We and our issuing bank partners are subject to borrower protection laws and federal and state consumer protection laws*.
>
> We and our issuing bank partners must comply with regulatory regimes, including those applicable to consumer credit transactions, various aspects of which are untested as applied to our marketplace.  Certain state laws generally regulate interest rates and other charges and require certain disclosures. In addition, other federal and state laws may apply to the origination and servicing of loans facilitated through our marketplace.  *In particular, through our marketplace, we may be subject to laws, such as*:
>
> * * *
>
> *Section 5 of the Federal Trade Commission Act, which prohibits unfair and deceptive acts or practices* in or affecting commerce, and Section 1031 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, which prohibits unfair, deceptive or abusive acts or practices in connection with any consumer financial product or service;
>
> * * *
>
> *[T]he Gramm-Leach-Bliley Act*, which includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they disclose such information and *requires financial institutions to disclose certain privacy policies and practices* with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information, and other privacy laws and regulations.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 20 -

* * *

While we have developed policies and procedures designed to assist in compliance with these laws and regulations, no assurance can be given that these policies and procedures will be effective in preventing violations of these laws and regulations. [Emphasis added in part]

80. On February 22, 2018, the Company filed its annual report on Form 10-K for the year ended December 31, 2017 with the SEC ("2017 10-K"). Defendants Sanborn and Casey signed the 2017 10-K. The 2017 10-K contained signed SOX certifications by Defendants Sanborn and Casey attesting that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

81. The 2017 10-K omitted the "no hidden fees language" contained in the 2016 10-K. In its place, LendingClub provided the following:

**Our Marketplace Solution**

We believe that our lending marketplace provides the following benefits to borrowers:

* * *

- *Transparency*. The installment loans facilitated through our lending marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, an origination fee and the ability to prepay the balance at any time without penalty. Our platform utilizes an automated, rules-based engine for applying the underwriting standards of the related issuing bank partner to an application and income verification, which significantly reduces the human bias associated with reviewing applications.

82. The 2017 10-K further provides:

*Current Regulatory Environment*

* * *

*Privacy and Data Security Laws*. **The federal Gramm-Leach-Bliley Act (GLBA)** includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

disclose such information, and ***requires financial institutions to disclose certain privacy policies and practices*** with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information. ***We have a detailed privacy policy, which complies with GLBA*** and is accessible from every page of our website. We maintain consumers' personal information securely, and only share such information with third parties for marketing purposes in accordance with our privacy policy and with the consent of the consumer. In addition, we take measures to safeguard the personal information of our borrowers and investors and protect against unauthorized access to this information. [Emphasis added].

83.     The 2016 10-K provides in relevant part under the section "RISKS RELATED TO OUR BUSINESS AND REGULATION" as follows:

[W]e and our issuing bank partners must comply with regulatory regimes, including those applicable to consumer credit transactions, various aspects of which are untested as applied to our lending marketplace. Certain state laws generally regulate interest rates and other charges and require certain disclosures. In addition, other federal and state laws may apply to the origination and servicing of loans facilitated through our lending marketplace.

While we have developed policies and procedures designed to assist in compliance with these laws and regulations, no assurance can be given that these policies and procedures will be effective in preventing violations of these laws and regulations.

* * *

Failure to comply with these laws and regulatory requirements applicable to our business may, among other things, limit our or a collection agency's ability to collect all or part of the principal of or interest on loans. As a result, we may not be able to collect our servicing fee with respect to the uncollected principal or interest, and investors may be discouraged from investing in loans. In addition, non-compliance could subject us to damages, revocation of required licenses, class action lawsuits, administrative enforcement actions, rescission rights held by investors in securities offerings and civil and criminal liability, which may harm our business and our ability to maintain our lending marketplace and may result in borrowers rescinding their loans.

84.     With respect to the "Current Regulatory Environment," the 2017 10-K stated in relevant part:

***Current Regulatory Environment***

* * *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 22 -

Privacy and Data Security Laws. The federal Gramm-Leach-Bliley Act (GLBA) includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they disclose such information, and requires financial institutions to disclose certain privacy policies and practices with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information. We have a detailed privacy policy, which complies with GLBA and is accessible from every page of our website. We maintain consumers' personal information securely, and only share such information with third parties for marketing purposes in accordance with our privacy policy and with the consent of the consumer. In addition, we take measures to safeguard the personal information of our borrowers and investors and protect against unauthorized access to this information. [Emphasis added].

85.    In addition, the 2017 10-K disclosed various detailed Risk Factors, applicable to the Company's operations and results. These Risk Factors included, in relevant part:

[W]e and our issuing bank partners must comply with regulatory regimes, including those applicable to consumer credit transactions, various aspects of which are untested as applied to our lending marketplace. Certain state laws generally regulate interest rates and other charges and require certain disclosures. In addition, other federal and state laws may apply to the origination and servicing of loans facilitated through our lending marketplace.

While we have developed policies and procedures designed to assist in compliance with these laws and regulations, no assurance can be given that these policies and procedures will be effective in preventing violations of these laws and regulations.

* * *

Failure to comply with these laws and regulatory requirements applicable to our business may, among other things, limit our or a collection agency's ability to collect all or part of the principal of or interest on loans. As a result, we may not be able to collect our servicing fee with respect to the uncollected principal or interest, and investors may be discouraged from investing in loans. In addition, non-compliance could subject us to damages, revocation of required licenses, class action lawsuits, administrative enforcement actions, rescission rights held by investors in securities offerings and civil and criminal liability, which may harm our business and our ability to maintain our lending marketplace and may result in borrowers rescinding their loans. (Emphasis added).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

86.     The above statements were materially false and/or misleading because Defendants knew or recklessly disregarded that: (i) the Company falsely promised consumers they would receive a loan with "no hidden fees" when the Company charged a hidden origination fee to all borrowers; (ii) the Company's privacy policy did not comply with the Gramm-Leach-Bliley Act; (iii) the Company falsely promised consumers that they would be approved for loans when, in fact, applications were subject to back-end denial; (iv) the Company withdrew funds from consumers' bank accounts without consumers' authorization; (v) the Company withdrew funds from consumers' bank accounts in excess of the amount consumers authorized the Company to withdraw; and (vi) as a result, this conduct would subject the Company's business practices to heightened FTC scrutiny leading to the FTC Complaint.

## THE TRUTH IS REVEALED

87.     On April 25, 2018, the FTC announced in a press release that it had filed a complaint against LendingClub (the "FTC Complaint") alleging violations of, *inter alia*, the FTC Act for falsely promising consumers they would receive a loan with "no hidden fees[,]" and other deceptive conduct, including unauthorized withdrawals and false promises of loans, all in violation of the FTC rules and regulations, and the Gramm-Leach-Bliley Act for failing to provide customers with a clear and conspicuous privacy notice so that each customer could reasonably be expected to receive actual notice.  The press release states in relevant part:

**FTC Charges LendingClub with Deceiving Consumers Defendant promises "no hidden fees" but charges them anyway**

April 25, 2018

The Federal Trade Commission has charged the LendingClub Corporation with falsely promising consumers they would receive a loan with "no hidden fees," when, in actuality, the company deducted hundreds or even thousands of dollars in hidden up-front fees from the loans.

"This case demonstrates the importance to consumers of having truthful information from lenders, including online marketplace lenders," said Reilly Dolan, acting director of the FTC's Bureau of Consumer Protection. "Stopping this kind of conduct will help consumers make informed choices about loan offers."

As stated in the FTC's complaint, LendingClub recognized that its hidden fee was a significant problem for consumers, and an internal review noted that its claims about the fee and the amount consumers would receive "could be perceived as deceptive as it is likely to mislead the consumer." An attorney for one of the company's largest investors also warned the company that the "relative obscurity" of the up-front fee in light of the company's prominent "no hidden fees" representation could make the company a target for a law enforcement action.

According to the FTC, LendingClub ignored these and other warnings and, over time, made its deceptive "no hidden fees" claim even more prominent.
The FTC also alleges that LendingClub falsely told loan applicants that "Investors Have Backed Your Loan" while knowing that many of them would never get a loan, a practice that delayed applicants from seeking loans elsewhere. In addition, in numerous instances, LendingClub has withdrawn double payments from consumers' accounts and has continued to charge those who cancelled automatic payments or paid off their loans, which costs consumers overdraft fees and prevents them from making other payments. In addition, LendingClub failed to get consumers' acknowledgment of its information-sharing policy as required by law.

The company is charged with violating the FTC Act and the Gramm-Leach-Bliley Act.

88. The FTC Complaint alleges that the Company was acting in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) and 45(n) by using deceptive practices with respect to hidden fees, unauthorized withdrawals and false promises of loan approval.

89. The FTC Complaint also alleges the Company was acting in violation of the Gramm-Leach-Bliley Act due to, *inter alia*, its failure to deliver the initial privacy notice so that each customer could reasonably be expected to receive actual notice.

90. On this news, shares of LendingClub fell $.49 per share, or over 15% from its previous closing price to close at $2.77 per share on April 25, 2018.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

91. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

92.     Plaintiff will adequately and fairly represent the interests of LendingClub in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

93.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

94.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

95.     The Company Board is currently comprised of ten (10) members – Sanborn, Ciporin, Denman, Mack, Mayopoulos, McCord, Meeker, Morris, Williams, and non-party Athey. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

96.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

97.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

98.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

99.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

100.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**The Director Defendants Are Not Independent or Disinterested**

**Defendant Sanborn**

101.     Defendant Sanborn is not disinterested or independent, and therefore, is incapable of considering demand because he (as its president and CEO) is an employee of the Company who derives substantially all his income from his employment with LendingClub, making him not independent.   As such, Defendant Sanborn cannot independently consider any demand to sue himself for breaching his fiduciary duties to LendingClub, because that would expose him to liability and threaten her livelihood.

102.     Additionally, LendingClub acknowledged that Sanborn is not independent in its Form DEF 14A filed with the SEC on April 17, 2018.

**Defendants Ciporin, Denman, Mayopoulos, and Williams**

103.     Defendants Ciporin, Denman, Mayopoulos, and Williams currently serve as members of the Audit Committee.   Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing Management's Discussion and Analysis, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

104.     Defendants Ciporin, Denman, Mayopoulos, and Williams breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and

other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business practices and disclosure issues and other deficiencies described above.  Therefore, Defendants Ciporin, Denman, Mayopoulos, and Williams face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Morris, Mayopoulos, and Williams**

105.    Defendants Morris, Mayopoulos, and Williams currently serve as members of the Risk Committee.  Pursuant to the Company's Risk Committee Charter, the members of the Risk Committee are responsible for, inter alia, reviewing the Company's risk governance structure and the Company's risk management and risk assessment guidelines and policies, and otherwise meet their responsibilities as set forth in the Risk Committee Charter.

106.    Defendants Morris, Mayopoulos, and Williams breached their fiduciary duties of due care, loyalty, and good faith, because the Risk Committee, *inter alia*, permitted a business structure and environment supporting the wrongful conduct as alleged herein (and even after repeated reporting of these issues to the Company), allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business practices and disclosure issues and other deficiencies described above.  Therefore, Defendants Morris, Mayopoulos, and Williams face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile

## COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108.    The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

109.    The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

110.    The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

111.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

112.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

**COUNT II**

**(Against the Director Defendants for Gross Mismanagement)**

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.    By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

115.    As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

116.    Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

**COUNT III**

**(Against the Director Defendants for Waste of Corporate Assets)**

117.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

119.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

120.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

121.    Plaintiff, on behalf of LendingClub, has no adequate remedy at law.

**COUNT IV**
**(Against the Director Defendants for Violations of Section 10(b)**
**of the Exchange Act and SEC Rule 10b-5)**

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    During the Relevant Period, the Director Defendants disseminated or approved public statements that failed to disclose (i) that LendingClub did charge upfront fees as part of its loan; (ii) that LendingClub had a two-step loan approval process, and the second step was more rigorous; (iii) that Lending Club made unauthorized withdrawals from borrowers' accounts; (iv) that LendingClub failed to comply with the GBLA and provide the required privacy notice; and (v) that as a result, the Company's current business metrics and financial prospects were not as strong as it had led the market to believe during the Relevant Period.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

124.    As such, the Director Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

>   (a)    employed devices, schemes, and artifices to defraud; and
>
>   (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

125.    As a result of the Director Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT V

### (Section 14(a) of the Exchange Act and SEC Rule 14a-9
### Against the Individual Defendants)

126.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except any allegation related to fraud, if any.

127.    SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. The Company's 2015-2018 Proxies violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because they neglected to mention material information concerning the Company's deceptive practices and compliance failures.

128.    The 2015-2018 Proxies were false and misleading when issued because they failed to disclose the truth about the Company's deceptive practices and compliance failures.

129.    In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the 2015-2018 Proxies were materially false and misleading.

130.    The misrepresentations and omissions in the 2015-2018 Proxies were material to Company stockholders in voting on the matters set forth for stockholder ratification in the 2015-2018 Proxies.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

131.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2015-2018 Proxies.

### COUNT VI

### (Misappropriation of Information and Insider Stock Sales
### Against Sanborn, Casey, and Williams)

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.    At the time of each of the stock sales set forth herein, Defendants Sanborn, Casey, and Williams knew that the Company was engaging in a scheme to deceive its loan customers. Defendants Sanborn, Casey, and Williams knew that that these facts would substantially harm the Company.   Defendants Sanborn, Casey, and Williams made each of the stock sales described herein on the basis of and because of their knowledge of the material non-public information described herein.

134.    At the time of their stock sales, defendants Sanborn, Casey, and Williams knew that when the Company's conduct came to light, the price of the Company's common stock would dramatically decrease. Defendants Sanborn, Casey, and Williams' sales of Company common stock based on their knowledge of this material nonpublic information was a breach of their fiduciary duties of loyalty and good faith.

135.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

### COUNT VII

### (Unjust Enrichment
### Against Defendants Sanborn, Casey, and Williams)

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    Defendants Sanborn, Casey, and Williams were unjustly enriched by their receipt of proceeds from their illegal sales of Company common stock, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

138.    The Court should order them to disgorge to the Company all proceeds derived from their illegal sales of the Company common stock.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

## PRAYER FOR RELIEF

2       **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

3       (A)       Declaring that Plaintiff may maintain this action on behalf of the Company and that

4  Plaintiff is an adequate representative of the Company;

5       (B)       Finding Defendants liable for breaching their fiduciary duties owed to the

6  Company;

7       (C)       Directing Defendants to take all necessary actions to reform and improve the

8  Company's corporate governance, risk management, and internal operating procedures to comply

9  with applicable laws and to protect the Company and its stockholders from a repeat of the rampant

10  wrongful conduct described herein;

11      (D)       Awarding Plaintiff the costs and disbursements of this action, including attorneys',

12  accountants', and experts' fees; and

13      (E)       Awarding such other and further relief as is just and equitable.

14

## JURY TRIAL DEMANDED

15      Plaintiff hereby demands a trial by jury.

16  Dated:  January 31, 2019                         By: /s/ Jon A. Tostrud

17                                                          Jon A. Tostrud, Esq.
                                                        **TOSTRUD LAW GROUP, P.C.**
18                                                      1925 Century Park East, Ste. 2100
                                                        Los Angeles, CA. 90067
19                                                      Tel: (310) 278-2600
                                                        Fax: (310) 278-2640
20                                                      Email: jtostrud@tostrudlaw.com

21

22                                                      **GAINEY McKENNA & EGLESTON**
                                                        Thomas J. McKenna
23                                                      Gregory M. Egleston
                                                        440 Park Avenue South, 5th Floor
24                                                      New York, NY 10016
                                                        Tel: (212) 983-1300
25                                                      Fax: (212) 983-0383
                                                        Email: tjmckenna@gme-law.com
26                                                      Email: gegleston@gme-law.com

27

28                                                      *Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Of Counsel:
**MOORE KUEHN, PLLC**
Fletcher Moore, Esq.
30 Wall Street, 8th Floor
New York, NY 10005

**VERIFICATION**

I, Rajender Cheekatamarla, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of LendingClub Corporation common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 25 day of January 2019.

_____
Rajender Cheekatamarla